CASE NO. 17–15176
————————————

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**
————————————

WILLIAM SILVERSTEIN,

*Plaintiff – Appellant,*

v.

KEYNETICS INC., a Delaware corporation; CLICK SALES INC., a Delaware corporation; 418 MEDIA LLC, an Ohio Limited Liability Company; LEWIS HOWES;

*Defendants – Appellees*

INSPIRED MARKETING, LLC, an Ohio Limited Liability Company; SEAN MALARKEY, an individual; and DOES 1-100,

*Defendants.*
————————————

ON APPEAL FROM THE JUDGMENT OF THE
UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

Honorable Donna M. Ryu – Case No. 4:16-cv-00684-DMR
————————————

**APPELLANT WILLIAM SILVERSTEIN'S REPLY BRIEF**
————————————

Timothy J. Walton (State Bar No. 184292)
WALTON TWU LLP
9515 Soquel Drive, Suite 207
Aptos, California 95003
(831) 685-9800 – VOICE

Mark Etheredge Burton , Jr. (State Bar No. 178400)
AUDET & PARTNERS, LLP
711 Van Ness Avenue, Suite 500
San Francisco, California 94102
(415) 568-2555 – VOICE

*Attorneys for Plaintiff – Appellant* WILLIAM SILVERSTEIN

# <u>TABLE OF CONTENTS</u>

I.    INTRODUCTION ................................................................................. 1

II.   APPELLEES' LEGAL POSITION WOULD ALLOW FOR "ANYTHING

GOES" IN EMAIL MARKETING ............................................................. 4

III.  APPELLEES MISCHARACTERIZE LEGAL AUTHORITY .............................. 6

    A.    Appellees Misstate Court Decisions ....................................... 6

    B.    CAN-SPAM ...................................................................... 10

    C.    Appellees Fail To Provide Any Support For  Their Position ............... 11

IV.  APPELLEES MISCHARACTERIZE THE FACTS ............................... 11

V.   THE ALLEGED VIOLATIONS OF LAW WERE NOT MERE

TECHNICAL VIOLATIONS ................................................................ 13

    A.    The Email Headers Contained Actual Falsity ....................... 13

    B.    The Standard For "Materiality" Is Whether The Sender Impaired The

Ability Of The Recipient To Determine The Identity of the Sender ................... 13

    C.    Recipients Could Not Determine Identities of Either Sender Or Advertiser

Without Clicking On A Link .................................................... 14

VI.  APPELLEES MISCHARACTERIZE APPELLANT'S LEGAL THEORIES ... 16

VII. CONCLUSION ..................................................................... 17

# <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                 **Page(s)**

*Balsam v Trancos, Inc.*, 203 Cal.App. 4th 1083 (2012) ....................... 9, 10

*Facebook, Inc. v. Power Ventures, Inc.*,

    844 F.3d 1058 (9th Cir. 2016) ...................................................... passim

*Gordon v. Virtumundo, Inc.*, 575 F. 3d 1040 (9th Cir. 2009) .......... passim

*Kleffman v. Vonage Holdings Corp.*, 49 Cal.4th 334 (2010) ..................... 1

*Omega World Travel, Inc. v. Mummagraphics, Inc.*,

    469 F.3d 348 (4th Cir. 2006) ........................................................ passim

*Rosolowski v. Guthy Renker LLC*,

    230 Cal.App.4th 1403 (2014) ..................................................... 1, 11, 16

*United States v. Kilbride*, 584 F. 3d 1240 (9th Cir. 2009) ....................... 9

*Wagner v. Spire Vision LLC*,

    No. 13-cv-04952, 2015 WL 876514 (N.C.Cal. Feb. 27, 2015) ........... 1, 11

**Statutes**

15 U.S.C. § 7701 .......................................................................... passim

18 U.S.C. §1037(d)(2) ............................................................................ 10

Cal. Bus. & Prof.§ 17529(d) ............................................................. 1, 17

## I.    INTRODUCTION

Email spam is a scourge of the Internet, causing billions of dollars in damages to the U.S. economy every year. (Cal. Bus. & Prof. § 17529(d).) The email spam at issue in this action is among the worst of the worst. Unlike nearly every other spammer that has been involved in an appeal about spam law, Appellees here left absolutely no way for their email to be traced back to them, aside from clicking on a link in the email, a click that actually puts money in their pockets. The email headers were not readily traceable to either the sender or the advertiser, as they were in *Gordon v. Virtumundo, Inc.*, 575 F. 3d 1040, 1064 (9th Cir. 2009) (through accurate information in WHOIS records), *Omega World Travel, Inc. v. Mummagraphics, Inc.*, 469 F.3d 348, 357 (4th Cir. 2006) ("chock full of methods to 'identify, locate, or respond to'"), *Rosolowski v. Guthy Renker LLC*, 230 Cal.App.4th 1403, 1407-08 (2014) (through registered trademarks in From Names), *Wagner v. Spire Vision LLC*, No. 13-cv-04952, 2015 WL 876514, *6 (N.C.Cal. Feb. 27, 2015) (email body contained mailing address), *Kleffman v. Vonage Holdings Corp.*, 49 Cal.4th 334, 339 (2010) (headers "literally and truthfully identify the sender"), and *Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058, 1063

1

(9th Cir. 2016) (Power Ventures used its real name in the emails). Appellees do not even discuss whether their headers are readily traceable (the crux of "materiality" under 15 U.S.C. § 7701 et seq. (CAN-SPAM)) because they know that their emails were not at all traceable unless a particular link in the email is clicked on and followed.

The general standard for material falsity or deception under CAN-SPAM is whether it impairs the ability of the recipient to locate the sender, not whether the spams are explicitly commercial, as the trial court found. Here, there is absolutely no way for a recipient to identify the person who transmitted the spam without the discovery process that accompanies litigation against the advertisers. And, even setting aside the identity of the senders, the only way a recipient can tell who is advertised in the email is to click on a link contained within the email body, subjecting the recipient to ransomware, viruses, and other dangers as warned against by computer experts and the United States Department of Homeland security. Respondent's brief makes a point that there are links to the advertiser in the emails. However, all spam, by definition, has a link to the advertiser in the emails. If merely having a link that leads to the advertiser were to make spam compliant with the

2

law despite the deceptive practices used to get recipients to open the email or click on the links, then *all* spam would be lawful, making CAN-SPAM and the plethora of state laws regulating spam superfluous.

Appellees' brief fails to refute the basic error of the lower court's ruling: the email headers at issue are materially false and deceptive under CAN-SPAM's own terms. Instead, they argue that a statute's prohibition on false headers is a labeling requirement.

Respondent's brief fails to address the fact that the lower court ruled that CAN-SPAM preempted the claims as not materially false or deceptive despite the fact that CAN-SPAM itself defines these claims as materially false or deceptive. The lower court erred by disregarding the explicit statutory language of the statute it used to preempt the claims as well as the argument of that point made below. Respondent's brief fails to reconcile this inherent inconsistency in statutory interpretation.

Finally, Respondents fail to state why using a false From Name that is unknown to the recipient versus using a false From Name that appears to be from a friend should be the demarcation between material falsity: both conceal the identity of the sender and both are false.

The spammers here went to great lengths to conceal their identities *and remain unknown*. Therefore, this Court should reverse the lower court ruling.

## II. APPELLEES' LEGAL POSITION WOULD ALLOW FOR "ANYTHING GOES" IN EMAIL MARKETING

If violation of the law is excused where an email is obviously commercial, then statutes regulating spam would be pointless. The only recipients who could make a claim would be the ones who don't know they have a claim. Appellees actually argue that there can be no claim unless the advertiser is completely hidden, but it wouldn't be spam if the ultimate advertiser could not be found. (Appellees' Brief at 9, 18.) Few advertisers want to remain completely hidden as the point of advertising is to make a sale. (*See, e.g., Omega*, 469 F.3d at 358 (the "messages were sales pitches intended to induce recipients to contact [the advertiser]".) Appellees are essentially arguing that no unsolicited commercial email should be regulated by California law or CAN-SPAM

The California legislature intended that its law be enforced by recipients rather than overburdened government entities. Congress

could have altered this, but chose not to remove that enforcement mechanism.

Appellees claim that its use of the linkedin.com domain was not a material falsity, but how is that different from sending deceptive commercial email from a gmail.com or yahoo.com domain? They point to the *Facebook* case, but in that case, Facebook (and its users) took an active part in drafting the emails that went out, and the From Names truthfully identified the authorized Facebook users who had authorized the use of their names. (*Facebook*, 844 F. 3d at 1065.) In the instant action, however, Appellees used the linkedin.com domain, without permission, using fake user profiles.

Here, the Appellees' agents actually intended to and successfully did hide their identities. They used the LinkedIn system so that the domain name would not have a WHOIS trail back to them, they used fake accounts at LinkedIn so that the names would be false in the headers of the emails, and nowhere in the body of the email did they identify any one associated with the advertising. This is similar to a situation where someone borrows a telephone from a stranger to make harassing telephone calls so that all the calls would then trace back to the stranger.

5

## III.  APPELLEES MISCHARACTERIZE LEGAL AUTHORITY

### A.  <u>Appellees Misstate Court Decisions</u>

1.  The *Gordon* case

Respondents claim that *Gordon v. Virtumundo, Inc.*, 575 F. 3d 1040, 1063-64 (9th Cir. 2009) stands for the proposition that "The use of a made up or technically false 'from' name is not materially deceptive where the recipient can identify the sender or the advertiser from the email." (Respondents' Brief at 15.) Actually, the opinion does not say that. The section of the opinion cited by Respondents refers to the use of fanciful domain names, registered to the defendant, with accurate WHOIS records showing that the defendant owned the domain. The Ninth Circuit in *Gordon* did not discuss whether a link in the body of the email adequately identifies the sender or advertiser. Here, the Respondents are trying to suggest that the *Gordon* opinion extends to "From Names", not just domain names, and that the opinion somehow suggests that a link in the body is adequate identification of the sender or advertiser. The *Gordon* court said no such thing.

The facts here are quite different from the facts in the *Gordon* case. The senders here did not use a fanciful domain name; they used someone

6

else's domain name. They did not use a domain name that identified them in the WHOIS; the records accurately show the actual registrant (LinkedIn). The Ninth Circuit in *Gordon* was considering a case where the sender of the emails was not actually trying to hide. Virtumundo, Inc. was identified in many places, including the WHOIS records. Respondents here, however, took steps to prevent the spam from being readily traceable back to them.

*Gordon* does not support the claim that an identification of the advertiser, not the sender, after following a link is "readily traceable".

### 2. The *Facebook v. Power Ventures* case

While similar in some ways, the *Power Ventures* case is distinguishable from the instant action for a number of reasons: 1. The Facebook users listed as senders were real people; 2. Access to Facebook's system was not the result of false pretenses; 3. Power Ventures had the permission of Facebook users to send the emails and use their names. Appellees claim that the Complaint in this action did not allege "that the defendants used false pretenses to access a LinkedIn account that was not theirs." (Respondents' Brief at 14.) In fact, however, the Complaint alleged that "Defendants took advantage of a social network's automated

7

email communication feature... for the purpose of sending the unsolicited commercial email at issue in this action." (Excerpts of Record ("ER") at 78.) "These spams violate LinkedIn's user agreement... Plaintiffs are informed and believe and thereon allege that LinkedIn did not authorize any Defendant to use its service for the purpose of sending the unsolicited commercial email at issue in this action." (*Id*.) The senders here used fake names to avoid being identified. (*Id*. at 79.) So, while Power Ventures relied upon real people giving valid permission, Appellees used fake names to fool LinkedIn into providing access to its system. Moreover, Appellees created the accounts on LinkedIn by assuring LinkedIn that they would not be sending spam. (*Id*. at 78.) The fake names and untruthful promises amount to false pretenses.

    3. The *Omega* case

In *Omega*, *supra*, 469 F.3d 348 (2006), plaintiff alleged technical mistakes, but did not claim any actual attempts to hide the identity of the sender or advertiser.

Appellees claim that the *Omega* claims were preempted because of links in the body. (Appellees' Brief at 16 (citing *Omega*, 469 F.3d at 351, 353.) But while the Fourth Circuit mentioned (in its recitation of facts)

8

that the emails contained a link to the advertiser's web site, that was not the basis for its holding. Instead, the court said that the Defendant made "errors" but provided multiple means of identification. (*Id.* at 357-358.) In the instant action, the spammers intentionally and successfully hid their identities and did not provide any, much less multiple, means of identification.

### 4. The *Trancos* case

Appellees use select quotations to deflect attention from the actual definition of "material" found in CAN-SPAM. They would argue that the statute should be read to mean "prevent" instead of "impair". However, this court has rejected that interpretation of "impair" under CAN-SPAM:

> '[I]mpair' clearly is not synonymous with 'completely obstruct.'
> To impair, according to its plain meaning, merely means to
> decrease.

*United States v. Kilbride*, 584 F. 3d 1240, 1259 (9th Cir. 2009).

Here, the impairments are numerous: false from names, use of a third party domain without permission, an email body that does not disclose either the true sender or the advertiser. These impairments to the identification of the sender are substantial because they actively conceal the senders of the emails to the average email recipient. And, the

only way to determine the advertiser in these emails is to click on the links and see where they go. The spammers themselves were successful in their deception, as they remain unidentified.

### B. <u>CAN-SPAM</u>

Appellees fail to discuss CAN-SPAM's definition of materiality (except in trying to argue that *Trancos* says something other than what it says). Instead, they claim that Plaintiff "offers no persuasive authority" for the proposition that "the alleged conduct survives preemption because it comports with the definition of material falsity or deception". (Appellees' Brief at 21.) Appellees conveniently ignore the arguments based upon the language of the statute itself. (Appellant's Opening Brief at 12-26.) CAN-SPAM states that

> header information or registration information is materially falsified if it is altered or concealed in a manner that would impair the ability of a recipient of the message, an Internet access service processing the message on behalf of a recipient… to identify, locate, or respond to a person who initiated the electronic mail message or to investigate the alleged violation. 18 U.S.C. §1037(d)(2).

### C.   Appellees Fail To Provide Any Support For Their Position

*Gordon* does not support spammers who use domains that are not readily traceable to senders. *Facebook* does not support spammers that pretend to be users. *Rosolowski* does not apply because the Appellees were hiding their identities and nothing in the body of the emails identifies the advertiser or the actual senders. *Wagner* does not apply because the senders were hiding their identities.

Appellees quote *Gordon* for the proposition that Congress passed CAN-SPAM in order to "target deceptive and predatory practices", but fail to indicate why their own deceptive practices would be fine with Congress. (Appellees' Brief at 12 (citing *Gordon*, 575 F.3d at 1049).)

## IV.   APPELLEES MISCHARACTERIZE THE FACTS

When discussing whether the Court considered the importance of the "From" Line in deciding whether to open an email, Appellees argue that it doesn't matter. "Courts consider content in the body of the email when deciding whether header information is materially false or deceptive. *E.g., Omega*, 469 F.3d at 351, 353 (considering links and information in the body of the emails); *Rosolowski*, 230 Cal.App.4th at

1406-7 (same)." (Appellees' Brief at 19.) Not only does this suggest that the courts in *Omega* and *Rosolowski* looked at links (which they did not), but it suggests that the emails at issue here contained some information in the body that would help to identify the sender or the advertiser. Nothing could be further from the truth. The emails at issue in the action used a tinyurl.com link, not even their own domain, and made no mention of who they are, where they are located, or how one could stop their unwanted emails short of leaving the LinkedIn group.

Appellees also claim, untruthfully, that Plaintiff did not allege that "the defendants used false pretenses to access a LinkedIn account that was not theirs." (Appellees' Brief at 14.) In fact, the operative pleading does make the allegation that Defendants violated the express terms of LinkedIn's user agreement. (ER at 78).

Incredibly, Appellees claim, without citation to the record, that a recipient of the email advertising could "determine the sender or advertiser from the emails" (Appellees' Brief at 17) and "the LinkedIn users who sent the messages could readily be identified." (*Id.* at 20.) The record on appeal shows otherwise. (ER at 79 (¶¶37-40).)

## V.  THE ALLEGED VIOLATIONS OF LAW WERE NOT MERE TECHNICAL VIOLATIONS

### A.  <u>The Email Headers Contained Actual Falsity</u>

Appellees admitted that the record indicates that the From Names were fictitious (Appellees' Brief at 3 (citing ER at 79 (¶37)). They cannot argue that the From Names indicated real people who were sending the email, because they know that is not the case.

### B.  <u>The Standard For "Materiality" Is Whether The Sender Impaired The Ability Of The Recipient To Determine The Identity of the Sender</u>

Without actually discussing or analyzing the text of CAN-SPAM, Appellees make the claim that mere impairment is not enough. (Appellees' Brief at 20.) However, the impairment here is substantial because there is no way to ascertain the actual senders of the spams absent discovery on the Appellees and/or LinkedIn.

Appellees even claim that using a domain name under false pretenses is somehow preferable to using a nonsensical domain with accurate WHOIS information. (Appellees' Brief at 20.) They fail to state why that would be.

**C.** **Recipients Could Not Determine Identities of Either**

**Sender Or Advertiser Without Clicking On A Link**

Respondents repeatedly point out that clicking on the links in the email will lead to the advertiser. The implication is that regardless of the other deceptive features in an email (such as a false From Name, untraceable WHOIS record in the sending domain or a body that falsely represents that another entity sent the email), clicking on the link "cures" the deceptions. However, clicking on unfamiliar links in emails can lead to an infection by malicious code such as malware, viruses or Trojan Horses, let alone more spam. (National Cyber Alert System, Cyber Security Tip ST04-001 (https://www.us-cert.gov/ncas/tips/ST04-001), Cyber Security Tip ST04-007.)

The senders in the instant action used similar deceptive tactics as the alleged hackers used to access the email of John Podesta, the campaign manager to Democratic presidential candidate, Hillary Clinton, in the Wikileaks incident. (New York Times, *The Perfect Weapon: How Russian Cyberpower Invaded the U.S., (*Dec. 13, 2016)):

> Billy Rinehart, a former D.N.C. regional field director who was then working for Mrs. Clinton's campaign, got an odd email warning from Google.

14

"Someone just used your password to try to sign into your Google account," the March 22 email said, adding that the sign-in attempt had occurred in Ukraine. "Google stopped this sign-in attempt. You should change your password immediately." Mr. Rinehart was in Hawaii at the time. He remembers checking his email at 4 a.m. for messages from East Coast associates. Without thinking much about the notification, he clicked on the "change password" button and half asleep, as best he can remember, he typed in a new password. What he did not know until months later is that he had just given the Russian hackers access to his email account.

Hundreds of similar phishing emails were being sent to American political targets, including an identical email sent on March 19 to Mr. Podesta, chairman of the Clinton campaign. Given how many emails Mr. Podesta received through this personal email account, several aides also had access to it, and one of them noticed the warning email, sending it to a computer technician to make sure it was legitimate before anyone clicked on the "change password" button.

"This is a legitimate email," Charles Delavan, a Clinton campaign aide, replied to another of Mr. Podesta's aides, who had noticed the alert. "John needs to change his password immediately."

With another click, a decade of emails that Mr. Podesta maintained in his Gmail account — a total of about 60,000 — were unlocked for the Russian hackers.

The Wikileaks hackers used a false From Name and false information in the body of the emails to induce the recipients to click on the link in the email resulting in having their emails stolen and possibly affecting the outcome of a presidential election. This incident alone

should illustrate that "merely" clicking on a link in an otherwise deceptive email is not a "cure" for the deception, and using false information such as false From Names or untraceable sending domains are material deceptions.

## VI. APPELLEES MISCHARACTERIZE APPELLANT'S LEGAL THEORIES

Appellees create a strawman in suggesting that Appellants seek a labeling requirement. Recipients of email want the headers in email to not be false or deceptive. Without saying "any impairment" (Appellees' Brief at 18), the impairments here are material. The spammers used an online service, without permission, in order to hide their actual identities and addresses. They could not be found through WHOIS (as the spammers in *Omega*, *Gordon*, *Facebook* and *Rosolowski* could be), there is no information about them in the body of the email, and the names in the headers were false.

The lower court apparently believed that since most people would see this sort of email as obvious junk, then there was not harm to the recipient. But the recipient still has to delete the emails as they come in, because there is no way to unsubscribe from them without leaving the

16

LinkedIn group. Furthermore, because of the false From Names, recipients are more likely to open the spams in order to determine if the emails are junk in the first place. Both the CAN-SPAM Act and California law recognize this lost time as a non-trivial harm. (15 U.S. Code § 7701(a)(3) and Cal. Business & Professions Code §17529(d).) The value of the group goes down as members leave because the unwanted email keeps coming. Appellees sent more than one hundred emails to the group, accomplishing their goal of sending advertising to thousands of people, each more than a hundred times, at no cost to Appellees. Their defense to this obnoxious and unlawful behavior? Everybody should be allowed to do it.

The marketplace needs a level playing field. Advertisers, publishers and recipients of commercial email need guidance from this Court about where the law draws the line.

## VII. CONCLUSION

As described herein, material falsity in the Defendants' advertising was properly alleged and stated a claim. These email headers are materially false and deceptive under CAN-SPAM and therefore the lower court erred in holding that CAN-SPAM preempted because the headers

17

were not materially false and deceptive. If this Court is unwilling to find that the second amended complaint alleged material falsity, then Congress' law, as well as that of the State of California, is abrogated.

Dated September 25, 2017          Respectfully submitted,

<u>s/ Timothy J. Walton</u>

Timothy J. Walton
WALTON TWU LLP

<u>s/ Mark Etheredge Burton , Jr.</u>

Mark Etheredge Burton , Jr.
AUDET & PARTNERS, LLP

*Attorneys for Plaintiff – Appellant*
*William Silverstein*

18

**Form 8.** **Certificate of Compliance Pursuant to 9th Circuit Rules 28-1.1(f), 29-2(c)(2) and (3), 32-1, 32-2 or 32-4 for Case Number** 17-15176

Note: This form must be signed by the attorney or unrepresented litigant *and attached to the end of the brief.*

I certify that (*check appropriate option*):

☐ This brief complies with the length limits permitted by Ninth Circuit Rule 28-1.1.
The brief is [        ] words or [        ] pages, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable. The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

☒ This brief complies with the length limits permitted by Ninth Circuit Rule 32-1.
The brief is 3434 words or [        ] pages, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable. The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

☐ This brief complies with the length limits permitted by Ninth Circuit Rule 32-2(b).
The brief is [        ] words or [        ] pages, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable, and is filed by (1) ☐ separately represented parties; (2) ☐ a party or parties filing a single brief in response to multiple briefs; or (3) ☐ a party or parties filing a single brief in response to a longer joint brief filed under Rule 32-2(b). The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

☐ This brief complies with the longer length limit authorized by court order dated [        ]
The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6). The brief is [        ] words or [        ] pages, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable.

☐ This brief is accompanied by a motion for leave to file a longer brief pursuant to Ninth Circuit Rule 32-2 (a) and is [        ] words or [        ] pages, excluding the portions exempted by Fed. R. App. P. 32 (f), if applicable. The brief's type size and type face comply with Fed. R .App. P. 32(a)(5) and (6).

☐ This brief is accompanied by a motion for leave to file a longer brief pursuant to Ninth Circuit Rule 29-2 (c)(2) or (3) and is [        ] words or [        ] pages, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable. The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

☐ This brief complies with the length limits set forth at Ninth Circuit Rule 32-4.
The brief is [        ] words or [        ] pages, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable. The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

Signature of Attorney or Unrepresented Litigant | s/ Mark Etheredge Burton , Jr. | Date Sep 25, 2017

("s/" plus typed name is acceptable for electronically-filed documents)

| 9th Circuit Case Number(s) | 17-15176 |
|---|---|

**NOTE:** To secure your input, you should print the filled-in form to PDF (File > Print > *PDF Printer/Creator*).

*********************************************************************************

# CERTIFICATE OF SERVICE
## When All Case Participants are Registered for the Appellate CM/ECF System

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on (date) Sep 25, 2017 .

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Signature (use "s/" format)    s/ Mark Etheredge Burton , Jr.

*********************************************************************************

# CERTIFICATE OF SERVICE
## When <u>Not</u> All Case Participants are Registered for the Appellate CM/ECF System

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on (date) .

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

I further certify that some of the participants in the case are not registered CM/ECF users.  I have mailed the foregoing document by First-Class Mail, postage prepaid, or have dispatched it to a third party commercial carrier for delivery within 3 calendar days to the following non-CM/ECF participants:

Signature (use "s/" format)